# B. FRANK HANWAY, Jr.,

## *vs.*

# BALTIMORE & OHIO RAILROAD COMPANY.

*Railroads*: *negligence; ice on steps of cars.*

In a suit by a passenger against a railroad for damages sustained because of the presence of ice, negligently allowed to remain on the steps of the car, by which the passenger was attempting to board the train, the mere presence of ice on the steps is not evidence of negligence. p. 542

But in such a case any evidence legally sufficient to show that ice that rendered the steps unsafe had been allowed to accumulate and remain there, when there had been ample time for its removal, should be allowed to go to the jury. p. 542

The weight of the evidence of the defendant, and the reasonableness of its theory that the ice on the steps might have been carried there by passengers, was a matter entirely for the jury. p. 542

*Decided June 24th, 1915.*

Appeal from the Circuit Court for Harford County. (HARLAN, J.)

The facts are stated in the opinion of the Court.

The cause was argued before BOYD, C. J., BRISCOE, BURKE, THOMAS, PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*J. J. Archer* (with whom was *W. W. Preston* on the brief), for the appellant.

*S. A. Williams,* for the appellee.

THOMAS, J., delivered the opinion of the Court.

In January, 1914, the Baltimore and Ohio Railroad Company operated a regular passenger train between Aiken, in Cecil County, Maryland, a station on its Philadelphia branch, and Baltimore City. According to the schedule the train left Aiken for Baltimore at 6.45 o'clock in the morning, and returning in the evening, left Baltimore at 6.10 o'clock and arrived at Aiken at 7.40 P. M., where it remained over night. Sewell Station, a station between Aiken and Baltimore, was a run of about twenty-seven minutes from Aiken, and the train was due there at 7.12 A. M.

On the evening of January 3rd, 1914, there was a rain and sleet storm which continued after the train arrived at Aiken, but stopped some time after ten o'clock during the night, and as early as 4.30 o'clock the next morning it was clear and very cold, the thermometer being about twenty or twenty-five degrees below "freezing point," and the ground was covered with sleet and ice. On the morning of the 4th of January, 1914, the plaintiff left his home in Harford County and drove about five miles to Sewell Station to take the train for Baltimore. When he arrived there the platform of the station was covered with ice and sleet. There were four passengers there for that train, including one lady, and when the train arrived the brakeman, as was his custom, placed a box below the step of the ladies' coach, and the lady and Mr. Durham entered that coach while the plaintiff and Mr. Webster got on the smoking car from the platform next to the one from which the lady and Mr. Durham entered. The plaintiff and Mr. Webster state that the lower step of the smoking car was about twenty-three inches above the platform of the station; that the steps were covered with ice, and that the ice was hard, clear and smooth. The plaintiff states what occurred when he was getting on the car as follows: "I went to Sewell Station that morning to take the train for Baltimore. I had a 100-trip ticket. The train pulled into the station perfectly natural and I walked down the steps (of the station) which were covered with sleet to

get on the train. Naturally when you go to get on a train you look up—I looked up to see if everything was clear. I took hold of the hand rail and stepped up with this foot (indicating his right foot). I had just a light satchel in the other hand, and as I swung up my foot went from under me, and I fell and caught myself on this knee (indicating his left knee). My whole weight went on this knee, and I didn't let go; I held on. The conductor was standing on the platform and saw me fall, and he made the remark he would have something put on there to keep people from falling. * * * Before I fell in getting on the train * * * I had not noticed anything particular about the steps. I first noticed they were icy when I fell; when I got down on the ice the ice was clear, just like a piece of glass; you could see the wood through it; when I fell I got down on my hands and knees; there was ice there, but I did not notice it before when I started to get on." After explaining how he injured his knee when he fell, he further testified on cross-examination: "Q. You stood on the station platform ready to step up? A. Yes, sir. Q. And you could look down on the first step and probably on the second? A. You would not look down when you were looking up to take hold with your hand; you understand, the platform you stand on to get in the car is about twenty-three inches lower than the first step—naturally, you have to look up to the coach to get hold of the hand rail. Q. That would bring it about your knee, wouldn't it? A. Yes, sir. Q. So that the first step was just below, right at your knee? A. Yes, sir. Q. And the second step was about your waist? A. Yes, sir. * * * Q. And the platform was about that high? A. About on a line with your chin. Q. When you got hold of the rail to help yourself up was there sleet on that? A. Sleet on the rail? Yes, sir; but when you are boarding a train you don't take all things in—you naturally catch hold of it; you put your foot up and swing yourself all up at the same time; you naturally look up to see if anybody is coming off before you do that. Q. You must notice what is in front of you? A. Yes;

you have to look a little ahead of you; you don't look at your feet all the time. Yes; the steps were right in front of me; but this ice, as I said before, was transparent; it was sleet and clear." When asked why he did not "go up by the box," he said if he had known he was going to hurt himself he would have done so, but that the trains are only supposed to wait a limited time, and he would have had to wait "until the lady and Mr. Durham got on; * * * The steps were there for us to get on; the conductor was standing on the platform; he did not make any remarks to be careful, that there was ice there."

Daniel L. White, the conductor, stated: "It was a clear morning, and to the best of my knowledge there was no ice to amount to anything; there was a little sleet started the day before, but to the best of my knowledge there was no ice. And there was no ice on the steps, to my knowledge. I was standing on the platform of the west end of the ladies' coach, and the plaintiff got on the east end of the smoker, right in front of me. He had two baskets, the best I can remember, one on each arm, this way; I don't know exactly who got on first; I don't just remember that part, but there was a lady and three gentlemen got on; there was a box placed by the ladies' car, I think by the brakeman, and the lady was assisted on there. * * * I did not say anything to Mr. Hanway (plaintiff) as he got on, to my knowledge. I did not make any remark about there being ice there, and that I would have put something there to prevent people from being hurt, or anything of that kind, because there was no ice there; we had salt in our train to put on before we started; we had people to come there before. We put salt on until we get the ice off; we usually put salt on; that cuts the ice. Of course, when we don't have that, we use ashes and sand." On cross-examination he testified that it was a clear and rather cold morning; that it was storming going up to Aiken the night before; that he did not know when it cleared off during the night, but that it was clear when he started in the morning. He further stated that when the

train reaches Aiken in the evening it is placed on an uncovered siding and remains there until morning, and that it was his duty to go to Aiken in the morning in time to see that his train was in proper order to leave there. When asked if he removed any ice from the steps that morning he said he did not, and on re-direct examination he stated that he examined the train that morning before it left Aiken and that it was in order; that he looked over the steps, and as far as he could see they were all right, and that if he had found ice on the steps he would have put salt on them. The brakeman testified that the plaintiff had two baskets when he got on the train, and that he did not slip or fall; that the step was clean; that they were inspected by "a hostler" who sweeps the train and clears off the steps before the train leaves Aiken in the morning. When asked if he inspected the steps himself, he replied: "Yes, sir; always." On cross-examination he testified that it was not his or the conductor's business to "clear off" the steps, but that it was the duty of a man named Scotty; that the reason he remembered that the plaintiff had two baskets was that he helped him to get on the train; that he guessed there was ice on the platform, as there ought to have been; that there was about two inches of snow or hail on the ground, which had fallen during the night previous, and that it was clear in the morning.

The declaration charges the negligence complained of as follows: "That the steps on one of the cars of said train were, by reason of the negligence of the defendant, in an unsafe and dangerous condition, in consequence of which the plaintiff, while entering said car, to be carried as a passenger, as aforesaid, in the exercise of ordinary care, was thrown down and seriously and permanently injured," etc. At the conclusion of the testimony the Court below granted the prayer of the defendant instructing the jury that under the pleadings there was no evidence in the case legally sufficient to entitle the plaintiff to recover, and this appeal is by the plaintiff from the judgment accordingly entered for the defendant.

The appellee in support of the instruction granted by the Court below cites and relies upon the cases of *Palmer* v. *Pennsylvania Co.,* 111 N. Y. 488, 2 L. R. A. 252; *Riley* v. *Rhode Island Company,* 15 L. R. A. (N. S.) 525, and *Sutton* v. *P. R. R. Co.,* 230 Pa. St. 523. In *Palmer's case* there is the following statement of facts by the Court: "It had stormed at various times during the night and morning, and the weather was cold and freezing. Whatever may have been the testimony, it is quite certain that the quantity of ice or snow was quite inconsiderable, and perceptible only after some inspection. It formed upon the platform of a passenger car attached to a through train, running from Chicago to Fort Wayne, in the course of its transit between those places. The plaintiff had taken his passage at Chicago for a place beyond Fort Wayne, had been upon the cars about two hours, when, about 5 o'clock A. M., they arrived at Mansfield, in the State of Ohio, where the accident occurred." After referring to the rule laid down in *Weston* v. *N. Y. El. R. Co.,* 73 N. Y. 595, the Court said: "This was applied to a case where the snow had fallen long before the accident and an effort had been made by the railroad company to remove it, but it had imperfectly performed their duty. We think even such a rule is not applicable to the removal of snow and ice on cars attached to a running railroad train traveling in the night during a continuous storm. The immediate and continuous removal of all snow and ice from such trains, or the covering of them with sand and ashes in such manner that no slippery places shall be at any time exposed, would be quite impracticable and beyond the duty which a railroad company owes to its passengers. The presence of snow or ice upon exposed places on moving cars is an accident of the hour, and no ordinary diligence could, during the prevalence of a storm, wholly remove its effects from the places exposed to its action," etc. In *Riley's case* the facts were like those in *Palmer's case,* and the Supreme Court of Rhode Island cited and relied upon it in holding, quoting from the syllabus: "A street car company is not liable for injuries to

a passenger who slips upon snow and ice accumulated during a storm upon a step after the car has started upon a trip." In *Sutton's case,* while the Court held that "no presumption of negligence arises from the presence on the steps of the car of a thin layer of ice," the Court held further that a case could not be withdrawn from the jury where there is evidence tending to show that the presence of the ice was the result of the defendant's negligence, and in the course of its opinion the Court said: "Again, we are not convinced the evidence established the fact that no ice was on the step when the train left Paoli. It is not denied that the ice was on the step when the train reached Broad Street Station, and if the jury should find as a fact that it had not passed through a snowstorm that morning, it would be a fair inference that the ice had accumulated at some prior time. If so, the inference of negligence in permitting the ice to remain on the steps for an undue length of time could be reasonably drawn by the jury."

The distinction between this case and the first two cases referred to above is obvious. Here it is admitted that it was clear and cold on the morning of the accident, and that there was no storm prevailing at the time the train started from Aiken or at any time during the run from there to Sewell Station. The ice on the steps, as testified to by the plaintiff's witnesses, can not therefore be accounted for as it was in those cases. It is also admitted that there was a sleet and rain storm the evening before which lasted well into the night, and that the car in question remained all night on an uncovered siding at Aiken. These admitted facts in connection with the evidence that the ground was covered with about two inches of snow, sleet and ice from the storm of the night previous; that the train arrived at Sewell Station about on time after a run of only twenty-seven minutes, and that the ice on the steps was hard and clear, were sufficient to go to the jury as the basis of a finding by them that the ice on the steps at the time of the accident was the result of the storm mentioned and was there when the car

left Aiken. It is true, the conductor and the brakeman stated that the steps were clean when the train started from Aiken, although they did not clean them off, and that it was the duty of the man named Scotty to clean them. But the weight of that evidence, and the reasonableness of the theory of the defendant that the ice on the steps might have been carried there by passengers who entered the train at other stations, was a matter entirely for the jury. We are not to be understood as holding that the fact that there was ice on the step at the time of the alleged injury would, standing alone, justify a presumption of negligence on the part of the Railroad Company. All we determine in this case is that there was some evidence from which the jury might have found that the ice was on the step when the train left Aiken, and that if that was so, and the ice rendered the steps unsafe, then there was evidence of negligence of the defendant.

In the case of *P., W. & B. R. R. Co.* v. *Anderson,* 72 Md. 519, JUDGE BRYAN said: "They (carriers) are bound to use the utmost degree of care, skill and diligence in everything that concerns the safety of passengers; nor are their duties limited to the mere transportation of them. They are bound to provide safe and convenient modes of access to their trains, and of departure from them"; and in the late case of *Smith* v. *N. C. Ry. Co.,* 119 Md. 481, JUDGE URNER, speaking for this Court, said: "It is not denied also that a carrier may be liable for injuries sustained through its negligence in permitting a platform it has provided for the use of its passengers to be in a unsafe condition on account of the presence of ice."

In the case of *Gilman* v. *Boston and Maine R. R. Co.,* 168 Mass. 454, 47 N. E. 193, the Court said: "We cannot say that the jury were not warranted in their finding. There was evidence of a snow storm which lasted all day in Salem, and most of the day in Boston. There was evidence that it stopped snowing in Boston at 9 in the evening, and that it was not snowing at Salem a little over half an hour later, when the.

plaintiff left a concert there, and took the train. The snow
was hard as if it had been there sometime. If this evidence
was believed, it was a possible inference that the snow was
on the steps before the train started. If so, and if it was in
such a condition that it was likely that some one would slip
upon it, the jury was warranted in finding that the condi-
tion ought to have been remedied at the earliest practical
moment." The case of *Neslie* v. *Second, Etc., Ry. Co.,* 113
Pa. St. 300, 6 At. 72, recognizes the same principle, and in
the last edition of *Thompson on Negligence,* Vol. 3, sec. 2829.
the author says: "It is the duty of railway carriers of passen-
gers, before starting the train, to remove snow from the steps
of the cars where passengers would be likely to slip upon it in
boarding and alighting. Evidence that snow on the steps of a
car was hard, as if it had been there sometime, raises an
inference that the snow was on the steps before the train
started." The case of *B., C. & A. Ry. Co.* v. *Trader,* 106 Md.
635, where the facts were very similar to those of the case
at bar, fully sustains the view we have expressed. As stated
in the opinion of that case: "The plaintiff was a passenger
on the defendant's train, with a ticket entitling her to be
carried safely from Ocean City to Berlin, a station on its
road. She took the train at Ocean City about twenty minutes
of seven o'clock on the morning of January 11th, 1906, and
the train arrived at Berlin about fifteen minutes later. As
the plaintiff was in the act of taking the train at Ocean City
she slipped on the step or platform of the car, and as she was
leaving the train at Berlin she slipped on the platform of the
car and fell down the steps to the station platform. She
offered evidence tending to show that the car in which she
rode had been left in the open during the night of January
10, 1906; that it had snowed during that night, and that on
the morning of the 11th the weather was clear and cold; that
snow and ice had accumulated upon the steps and platform
of the car which had not been removed when she boarded
the train at Ocean City, nor had it been removed at the time
she attempted to leave this car at Berlin; that it was the

presence of this snow and ice which caused her to slip when she boarded the train, and which caused her to fall at Berlin. * * * Upon the material points in the case the evidence is conflicting. The defendant's evidence tended to show, first, there was no snow or ice upon the steps or platform of the car; secondly, that the plaintiff fell because of carelessness on her part in stepping over the edge of the platform," etc. The fifth prayer of the defendant, which was rejected by the Court below, was as follows: "That if the agent of the defendant before the train left Ocean City used reasonable care in cleaning off the platform of the car by which the plaintiff traveled from Ocean City to Berlin, and by the use of such care was unable to discover any snow or ice on said platform, then their verdict must be for the defendant, notwithstanding the fact that the plaintiff's slipping was caused by snow or ice on said platform." In disposing of that prayer, Judge Burke said: "The fifth prayer of the defendant could not have been granted. It was misleading in its statement of the degree of care required of the defendant toward its passengers, and it ignores the fact that the defendant had ample opportunity to have discovered the ice and snow on the steps and platform of the car and to have removed it before the arrival of the train at Berlin." *Trader's case* also disposes of the suggestion of the appellee that the plaintiff was, as matter of law, guilty of contributory negligence.

The first and only other exception in this case was not pressed by the appellant, and it is only necessary to say that the plaintiff should have introduced the evidence excluded in that exception when the witness was examined in chief, and that there was no error in that ruling of the Court below.

Because of the error in granting the defendant's prayer withdrawing the case from the jury, the judgment of the Court below must be reversed and the case remanded for a new trial.

*Judgment reversed, with costs to the appellant, and a new trial awarded.*